[No. 3068, Sept. 17, 1927]

FORD v. NORTON et al.

[260 Page 411.]

#### SYLLABUS BY THE COURT

1. Where, as a controlling consideration for a lease of a filling station, the lessee covenanted, in addition to payment

[1] 13CJ p. 623 n. 80.    [2-4] 13CJ p. 647 n. 24; p. 648 n. 25; 17CJ p. 410 n. 40; 22CJ p. 187 n. 10; 38CJ p. 1261 n. 8 New; 35Cyc p. 104 n. 88; p. 105 n. 4; p. 106 n. 13 New; p. 249 n. 51.

of rent, to purchase gas exclusively from the lessor, the latter covenanting to supply it at current market prices, a rescission of the lessee's covenant to buy because of a breach of the lessor's covenant, leaving the lease otherwise in force, is inequitable; the contract not being so separable as to permit of partial rescission.

2. The parties being bound by a mutual covenant to buy and sell gasoline, during a long period, at current market prices—

(a) The seller is obligated to deliver at the price current in the market when the buyer demands delivery.

(b) The best proof of such price is actual sales made.

(c) The seller's obligation is not affected by the fact that the current market price is the result of a temporary trade war.

(d) The seller's obligation is not affected by the fact that the buyer encouraged the trade war to the extent of purchasing of a concern invading the market and breaking the price, he having first given the seller an opportunity to meet the price.

(e) The buyer, by the encouragement mentioned in (d), has not rendered the seller's obligation impossible of performance.

Appeal from District Court, Union County; Leib, Judge.

Suit by C. N. Ford against William Norton and another, copartners doing business as Norton & Wood, for an injunction and for damages. From a decree for defendants, plaintiff appeals. Reversed and remanded, with directions.

Crampton & Darden, of Raton, for appellant.

Easterwood & Thompson, of Clayton, for appellees.

OPINION OF THE COURT

WATSON, J.    C. N. Ford, plaintiff below, is the owner of a wholesale oil and gasoline business at Springer. He is also the assignee of the lessee's interest in a lease made in January, 1922, of land in Springer for a period of 10 years, for the purpose of erecting and maintaining a retail oil and gasoline filling station to be constructed by the lessee according to specifications set forth, and to revert to the lessor at the end of the term. He is also the assignee of the lessor's inter-

est in a sublease of the same premises. The sublessee, appellees' assignor, undertook performance of all the covenants assumed by his sublessor (lessee in the original lease), including the erection of the filling station and payment of the monthly rent and for the whole of the original term. In addition to these covenants and others usual to leases, the sublease contained paragraphs 9 and 10, which are particularly in question here, and which are as follows:

"IX. That said lessee covenants and agrees with said lessors that during the life of this lease he will purchase all gasoline, oil, and greases usually handled by an automobile station from said lessors, which are or shall be used or sold on said demised premises in and about the operation of the said automobile filling station, and will pay to the said lessors the current market price therefor, and that he will not directly or indirectly buy, use, handle, distribute, or sell any gasoline, oil, or greases usually handled by an automobile filling station at, about, or on said premises which are not purchased from said lessors, nor will he suffer or permit the same to be used, handled, distributed, or sold thereon.

"X. That the said lessors covenant and agree with the said lessee that said lessors will, at all times during the life of this lease, reasonably endeavor to keep and maintain a supply of gasoline, oil, and greases usually handled by a wholesale oil station, and will sell and deliver to the said lessee such items and quantities thereof as may be reasonably required by said lessee for use and sale upon said demised premises and in and about the operation of said automobile filling station at current market prices."

Though both parties are assignees, their rights may be here determined as if they were the original contracting parties.

Up to September 24, 1924, Norton and Wood, the defendants, purchased all of their gasoline, etc., from the plaintiff according to the agreement; but on that date, and thereafter, until the hearing, they purchased a substantial portion of their gasoline from the Clayton Coal & Oil company. This led to the filing of a complaint by Ford October 6, 1924, in which he set forth the contracts above mentioned; alleged that he had always been able and willing to furnish gasoline, etc., to the defendants according to the contract, and that he had

in all respects performed the terms of the contract binding upon him, notwithstanding which, defendants had ceased to purchase their supplies of gasoline, etc., entirely from him, and were buying a substantial portion of such supplies from others, and praying that the defendants be enjoined from so doing, and for damages for the breach of the contract. The defendants, by their answer, treated by court and counsel as a counter claim, defended as against the claimed breach by them on the ground that the plaintiff, in violation of paragraph 10 of the contract, had refused to sell them gasoline at the current market price, but, on the contrary, had demanded from 3 to 5 cents per gallon in excess of such market price. They prayed that the plaintiff "be required to perform and carry out the said contract, or that paragraphs 9 and 10 of the said lease be decreed null and void and be stricken from the said contract," and that defendants recover damages.

The trial court, after hearing, found that the current market price of gasoline at Springer during the time in question was 17 cents per gallon, and that the plaintiff had refused to sell the same to defendants at such price, but had demanded, and had received, for such quantities as he had sold them during that time, from 18 1-2 to 20 cents per gallon; denied any relief to plaintiff; and, because of the breach of paragraph 10 of the contract, decreed that "the said defendants are hereby relieved from buying gasoline, oil, or greases from the plaintiff for use and distribution in and about their filling station at Springer." No damages were awarded. From this decree plaintiff has appealed.

Appellees do not deny that they made large purchases of gasoline from the Clayton Coal & Oil Company during the time in question, nor question that such fact, standing alone, would have entitled appellant to the injunction which he sought. They seek to support the decree entirely upon the proof and finding that plaintiff had breached the contract by demanding more than the current market price for gasoline.

[1] It will be convenient, first, to consider the af-

firmative relief awarded to the defendants. The effect of this action was to leave the sublease in full effect and the defendants in possession of the premises for a long term of years, relieved of the obligation contained in paragraph 9. Appellant contends that, as the parties contemplated no such situation as this, the result is to make a new contract, which the court was without power to do. He urges that for a breach of the contract by appellant, appellees are limited to the remedies of rescission in toto or of damages.

Appellees take the position that the contract is divisible; that paragraphs 9 and 10 constitute a subsidiary or collateral agreement, separable from the remaining covenants; and that in such a case partial rescission, as here awarded, is a recognized and proper remedy. They first cite 6 R. C. L. 926, to the proposition that under the facts in the present case they were not entitled to rescission in toto. This may be conceded without affecting the result. They next cite 6 R. C. L. 936, where it is said:

"As a general rule the right to rescind must be exercised in toto. The contract must stand in all its provisions, or fall together. Accordingly, a party cannot repudiate a contract or compromise so far as its terms are unfavorable to him and claim the benefit of the residue. As a partial rescission is not allowed by law, one who has sufficient cause to rescind a contract for fraud must rescind the whole or none. But it is not to be overlooked that this is a rule of construction, based upon the intention of the parties to the contract, and not a rule of law controlling that intention. A partial rescission may therefore be allowed where the contract is a divisible one."

The illustrative case cited to this text is Bank of Antigo v. Union Trust Co., 149 Ill. 343, 36 N. E. 1029, 23 L. R. A. 611. It was there held that the transaction of discounting three notes was separable, so that there might be a rescission as to one without a total recission. Johnson Forge Co. v. Leonard, 3 Pennewill, 343, 51 A. 305, 94 Am. St. Rep. 86, 57 L. R. A. 225, and Kauffman v. Raeder (C. C. A.) 108 F. 171, 54 L. R. A. 247, the decisions cited by appellees, are clearly not in point. It is unnecessary to question the abstract proposition that, if paragraphs 9 and 10 constituted an independent

or collateral contract, separable from the remainder of the lease, the judgment would be correct. Appellees themselves admit that, if not so separable, the judgment is erroneous. They advance no argument to support their view of the divisibility, of the contract, except to say:

"Covenants 9 and 10 of the lease contract are not the entire consideration for which said contract was given."

That is true. But the fact does not aid appellees. The contract itself (paragraph 1) shows that the obligation assumed by appellees in paragraph 9 was "a controlling consideration for the giving of this lease." Its importance as consideration is obvious. The other duties assumed by appellees were obligations which appellant was himself required to perform by the terms of his own lease. The plain purpose of the whole transaction was to procure for appellant, during a long term of years, an outlet and assured market for the goods he had for sale. Otherwise there was no profit for him in the transaction, and he simply incurred responsibility without compensation. The judgment results in leaving appellees in possession of all the benefits and relieved of the substantial obligation. It wipes out the controlling consideration flowing to appellant and results in a forfeiture of his property. Practically speaking, appellant is in far worse situation than if the court had awarded appellees that which they did not ask and here contend they were not entitled to—a rescission in toto. The latter would have been comparatively harmless, because appellant then would have had restored to him the possession of the demised premises, and might have found others to contract with him and to assume the obligation from which appellees have been relieved. It is clear to us that the present result is inequitable, and that the affirmative relief awarded to appellees cannot be sustained.

This brings us to the question of the correctness of the court's refusal to grant the injunctive relief demanded by appellant. Of course, to warrant enjoining violation of paragraph 9, appellant must be found to

have observed paragraph 10, wherein he agreed to hold himself ready to sell gasoline, etc., to appellee at current market prices. Although it is admitted that the purchases by appellees of which appellant complains were made at 17 cents a gallon, and that appellant was at the same time demanding from 18 1-2 to 20 cents, he insists that his demanded prices were market prices. He contends that the evidence shows that at the time in question a so-called gas war was in progress at Clayton, a somewhat distant point, by reason of which dealers at that place were procuring their gasoline much under the market price at Springer; that appellees, with competing dealers at Springer, wishing to take advantage of the situation, induced a Clayton wholesaler to bring gasoline to Springer in trucks; that this gasoline war was a temporary and abnormal conditon, and that it was carried on at a loss; that the wholesaler who sent his gasoline from Clayton to Springer operated at a loss; that he never sent enough gas to supply the local market, so that frequently, during the period in question, the retail dealers at Springer were compelled to purchase from appellant and from Continental Oil company, also wholesaling in Springer, at from 18½ to 20 cents per gallon. Upon these claimed facts appellant bases two main propositions: First, That the court erred in finding that the current market price during the period in question was 17 cents. Second. That if, indeed, the market price was 17 cents, appellees' contract obligations prevented them from taking advantage of it and supplying themselves with gasoline at such price.

Contending ,as is probably true, that during the time in question there was not enough 17-cent gas to supply the demand at Springer, and that sales were made by appellant and by Continental Oil Company at 18½ cents to 20 cents, appellant urges the doctrine, often stated, that the expression "market price" means the highest market price; that admitting 17 cents to have been a market price, 18½ and 20 cents were also market prices; that appellees, by their contract, were obligated to pay the highest market price. The many cases cited

by appellant were doubtless correctly disposed of upon the facts. Although, technically speaking, the terms "highest" or "lowest" market prices, as referring to the same time, would seem to be misnomers, they are correct enough as applied to particular cases, for instance, in assessing damages for a conversion, as in Bradley v. Hoker et al., 175 Mass. 142, 55 N. E. 848; in assessing damages for breach of contract to purchase a specific article, as in Stanley v. Sumrell (Tex. Com. App.) 163 S. W. 697; in condemnation of real estate, as in Little Rock Junction R. R. Co. v. Woodruff, 49 Ark. 381, 5 S. W. 792, 4 Am. St. Rep. 51; for breach of contract to convey land, as in Dady v. Condit, 209 Ill. 488, 70 N. E. 1088; in assessments for taxation purposes, as in Winnipiseogee Lake Cotton and Woolen Mfg. Co. v. Laconia, 68 N. H. 284, 35 A. 252, and Mass. General Hospital v. Inhabitants of Belmont, 233 Mass. 190, 124 N. E. 21; or damages for loss under fire insurance policy, as in Prussian National Insurance Co. v. Lawrence (C. C. A.) 221 F. 931, L. R. A. 1915 E, 489. But in the case at bar we are not to assess damages for a wrongful act, or to fix compensation for the taking of property against the owner's will. We are to decide from the language used what was the reasonable intention of parties who contemplateed a course of dealing involving daily purchases and sales extending over a term of years.

The contract did not specify that appellees were to pay the "highest" market price. It is safe to say that, if a contract containing such a provision had been tendered for appellee's signature, it would not have been signed. The word "highest" would have suggested endless disagreement between the parties and the danger of being undersold by competitors who might be foresighted enough to supply themselves at the "lowest" market price. It is much more reasonable to suppose that the contracting parties intended to sell and buy, respectively, at the "lowest" market price. Appellees, bound for ten years, and themselves compelled to compete in the retail market, must, if their business was to prosper and survive, be able to buy as cheaply

as competitors could. Of course, section 10 was for
their benefit and should be so construed as to give them
such advantage as may reasonably have been intended.
So, if the expressions used were deemed ambiguous,
calling for consideration of the conditions existing and
the situation of the contracting parties and the bring-
ing in of a qualifying adjective, we should prefer "low-
est" to "highest."

[2-4] We do not think, however, that there is am-
biguity. "Current market price" in a case of this kind,
means that the contract shall run or flow with the mar-
ket, following its fluctuations. The market price of
a commodity is the exchange value. It is determined
by the demand for it in relation to the supply, and is
proved, when possible, by actual sales. Appellant ar-
gues that market price is to be determined by certain
imaginary normal conditions of trade. This is un-
sound. Low markets are usually the result of being
glutted by the anxiety or necessity of some owners to
dispose of their goods, even at a loss. The costs of pro-
duction and of doing business, of course, have their in-
fluence in establishing price. But it is only in the long
run. Immediately, market price is fixed by supply
and demand. The Clayton Coal & Oil Company, in
order to move gasoline, put it on the market at 17 cents.
So long as that supply lasted, the market price was
17 cents. We cannot see that it matters whether its
motive was to destroy competition or quickly to raise
money to meet pressing obligations, or whether it lost
or profited by its transactions. When that supply was
exhausted, the relation between supply and demand
changed. Gasoline was then unobtainable in Springer
at less than 18½ cents. So that became the market
price.

Both counsel seem to make the mistake of assuming
that some figure is to be found to represent a market
price during the period in question. Appellant seizes
upon the proof of sales made at 20 cents and contends
that such sales establish "highest market price," and
that such is the contract price. Appellees rely on sales

at 17 cents as establishing "lowest market price," and contend that such is the contract price. The truth is that both of those prices prevailed at different times during the period. They were "highest" and "lowest" market prices for the period, possibly for particular days of the period. But those prices did not coexist. They succeeded each other. The court's finding that the market price was 17 cents during the period is inaccurate. It is of no consequence, however, since appellees always purchased of appellant except when the latter refused to meet the then market price.

Appellant finally contends that, even though the market price was 17 cents during the period in question, as the court found, it was still appellees' duty to buy from appellant at 18½ to 20 cents. He argues that the parties contemplated a long period of mutual dealing; that each must have expected and intended that the other should enjoy a profit from their transactions; that in fixing "current market prices" as the contract prices, it was not intended that appellant should be required, at a loss to himself, to meet the competition caused by temporary and abnormal conditions; but that, on the contrary, they contemplated a normal, conservative course of dealing which in the long run would be advantageous to both. This contention has some plausibility, but cannot be admitted. If it were given effect, a provision obviously for appellees' protection would be so warped as to inure to the sole advantage of appellant. It would be just as ruinous to require appellees to pay 18½ cents for gasoline when their competitors were buying for 17 cents as it would be to require appellant to meet that price at a loss. The parties might have contracted as appellant contends they did, but they have, in fact, made use of a well understood and unambiguous expression, to which they are to be held.

But it is urged that because, as appellant claims, the appellees interested themselves in the trucking of gas from war territory, and encouraged it, they are estopped from setting up a subnormal market price thereby established. It is sufficient answer to this contention

to say that it is not clearly shown that appellees did more in the way of encouragement than to buy the gas when offered to them, and after first giving appellant an opportunity to meet the price. That does not amount to an impossibility of performance brought about by appellees' conduct, within the rule laid down in 2 Williston on Contracts, § 677, 6 R. C. L. 1020, 13 C. J. 647, and the numerous decisions cited by appellant. We need not speculate as to what extent, if at all, the relations of the parties and the obligations of the contract should be deemed to restrain the liberty of appellees to interfere with or influence the wholesale market price of gasoline. The argument does not warrant it. Appellant takes the advanced position that appellees' conduct made appellant's covenant impossible of performance. The case is far outside the legal principle invoked. No authority has been cited, and we know of none, to sustain the contention.

We are persuaded, therefore, that the court properly denied the injunction asked by appellant, but that he erred in granting appellees' prayer for a partial recission. The judgment is reversed. The cause will be remanded with direction to dismiss, both as to the complaint and as to counterclaim.

It is so ordered.

PARKER, C. J., and BICKLEY, J., concur.